FILED

09/23/2022

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 16, 2022 Session

IN RE HOPE G. ET AL.

Appeal from the Circuit Court for Greene County
No. CC20AD6        Beth Boniface, Judge

_____

No. E2021-01521-COA-R3-PT
_____

This appeal arises from the termination of a father's parental rights to his minor child, upon the statutory grounds of abandonment by failure to visit and financially support the child. The Greene County Circuit Court ("Trial Court") denied the ground of failure to manifest an ability and willingness to assume custody of and financial responsibility for the child, pursuant to Tenn. Code Ann. § 36-1-113(g)(14). The Trial Court further found that termination of the father's parental rights was in the child's best interest. We reverse the statutory ground for the termination of the father's parental rights of abandonment by failure to visit, determining that the father had proven by a preponderance of the evidence that his failure to visit was not willful. We affirm the remaining ground for the termination of the father's parental rights, as well as the trial court's determination that termination of the father's parental rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

T. Wood Smith, Greeneville, Tennessee, for the appellant, Jamie G.

Crystal G. Jessee, Greeneville, Tennessee, for the appellees, Lance H. and Kristen H.

# OPINION

## Background

The minor child, Makayla G. ("the Child" or "Makayla"), was born in 2009 to Kristen H. ("Mother") and Jamie G. ("Father"). Mother also had two older half-siblings of the Child, Faith G. and Hope G., residing in her home.[1] Sometime after the Child was born, Mother and Father ended their romantic relationship. Mother asked Wilma S., the Child's paternal great-grandmother ("Great-Grandmother"), to facilitate visitation and communication between the parents, to which Great-Grandmother agreed.

In 2014, Father filed a petition to legitimate in the Greene County Juvenile Court ("Juvenile Court"), seeking to establish paternity of the Child. Father had a history of drug use and, at some point, was taking methadone. The parents attended mediation and came to an agreement that never was filed with the Juvenile Court. Pursuant to the parents' agreement, Father would receive supervised visitation with the Child every other weekend. Following the agreement, Great-Grandmother supervised Father's visitation with the Child every other weekend. According to Great-Grandmother, she supervised the visits because of Father's previous drug use. Makayla testified that on Father's visitation weekends, she saw Father for approximately five hours and that Great-Grandmother cared for her during the weekend visits. According to Makayla, Father made her uncomfortable most of the time during visits and if she had to return to visit or live with Father, she would be worried that Father would hurt either her or Great-Grandmother.

Mother married Lance H. ("Stepfather") in 2017, and a half-sibling of the Child, Atticus, was born subsequently. Makayla had been involved with cheerleading since the second grade and, at the time of trial, was an avid cheerleader and tumbler for both her school team and two competitive, all-star teams. Makayla testified that Stepfather often transported her to her sporting events; however, Father had never attended any event even when he was receiving visitation despite being provided with notice of the events by Mother and Makayla. Makayla testified that although Father promised her he would attend approximately ten to fifteen times, he never did. Makayla testified of the close bond she has with Stepfather and when asked during trial who her father was "as far as [Makayla is] concerned," she identified Stepfather.

Father had a car accident in April 2019, during which he was significantly injured with brain trauma, a broken shoulder, and bruised lungs. To explain positive drug test results at the hospital, Father testified that paramedics gave him benzodiazepines, opioids, and THC. He also stated that methadone was still in his system at the time of the accident

---

[1] The termination action also involves the children, Faith G. and Hope G., whose father, Scotty G., was a co-petitioner in the termination petition and consented to the adoption of his two children by Stepfather. Scotty G.'s parental rights to Faith and Hope are not at issue in this appeal.

from a previous prescription, but in his deposition a few months prior to trial, he testified that he had not been to a methadone clinic for "a few years, like, several years." When he was specifically questioned about the THC being illegal, he testified that the "vapor things" were available at the tobacco store. According to Father and Great-Grandmother, Father had ongoing medical issues following the car accident, including surgery on his shoulder, physical therapy, and intermittent memory lapses.

Up until September 2019, Father received supervised visitation with the Child every other weekend at Great-Grandmother's home. Makayla testified of two incidents that occurred during Father's visits in September 2019. During the first incident, Makayla testified that she was scared and hid under a table because Father was yelling at Great-Grandmother and "started pushing her and being really mean." The Child's sister, Hope, verified that the Child got into the vehicle after the visit and appeared nervous and scared and began crying as they were leaving. The second incident occurred during the next visit when Father had called Great-Grandmother to pick him up from his girlfriend's house. Father's girlfriend followed them back to Great-Grandmother's home, where Father and the girlfriend got into an argument. The Child testified that she ran and hid in Great-Grandmother's bathroom, was upset and crying, and sent text messages to Stepfather to come pick her up. Stepfather picked the Child up from that visit and the Child appeared upset and was crying. According to Mother, Father was arrested for domestic violence stemming from events that occurred while the Child was present at the last visit.

Mother testified that after those visits, the Child had difficulty sleeping and concentrating for several weeks thereafter. Mother testified that she thought a "pause" of Father's visitation after these incidents was in the Child's best interest and that Great-Grandmother agreed. Although the Child testified that Mother left visitation with Father at the Child's discretion, Mother testified that during a conversation with Great-Grandmother, she would not agree to Makayla returning to visit at Great-Grandmother's home with Father present "until he had some kind of therapy or something that made him a little bit more stable." Mother testified that she believed Father was a "ticking time bomb," explaining that he was unstable and had anger management issues.

Mother acknowledged that she never informed Father or Great-Grandmother that the pause had ended. Great-Grandmother denied having any conversation with Mother regarding a pause in visitation, and both Father and Great-Grandmother testified that they had attempted to contact Mother to visit the Child but their telephone calls did not go through. Father testified that his lack of visitation with the Child was not his choice and alleged that Mother had blocked his telephone number so that he could not call but that it had "come back on right before [their] court date." Both Mother and the Child denied receiving any telephone calls from Father or Great-Grandmother after September 2019 or that they had blocked any calls from them.

- 3 -

Father had been on social security disability since 2009, and he signed the Child up to receive benefits after she was born. Father testified that Mother had been receiving the social security benefits for the Child until two years before trial; however, Mother stated that she did not learn Father was receiving social security disability benefits until 2017. According to Father, a representative with social security had contacted him about two years prior to trial, informing him that they were unable to contact Mother and advising him to designate himself as the new recipient of the Child's benefits or they would be cancelled. Thereafter, it is undisputed that Father received the Child's social security benefits. Father received over $1,500 per month for his social security benefits. Bank records reflect that the Social Security Administration paid Makayla's benefit to Father of $660 per month in 2018; $678 per month in 2019; and $689 per month in 2020. During depositions in June 2021, Father testified that his monthly expenses were $470; however, the expenses he testified to at trial totaled over $1,100.

The parties testified that for a period of time, Father required Mother to provide Father with receipts of expenditures for the Child. Father testified that this was to provide the information for purposes of social security. According to Mother, Father had informed her that she "would not receive a dime" of the Child's social security benefits unless Mother gave him "every single receipt." Mother stated that at some point, she stopped providing him with receipts and that Father "just would not turn over anything." It is undisputed that Father paid the Child's cheerleading fees of $59 per month for a period of time, which the Trial Court credited to him from February 2019 through July 2020. However, Mother testified that due to insufficient funds in Father's account for three months, she had to pay the cheerleading fees and return fees for those months; therefore, Mother began paying the Child's cheerleading fees from that point forward. She testified that Father had not attempted to pay for anything since that time. Mother denied that Father had paid any child support between August 13, 2020 through December 15, 2020. Father testified that he had placed Makayla's social security benefits in a bank account for her with a balance of approximately $11,000 at the time of trial. However, the Trial Court found that after Father had stopped visiting with Makayla, he had continued to pay a Cash Express bill from her account and withdraw funds periodically through at least July 2020, as reflected in the bank statements entered into evidence. No bank records were provided for the time period after July 2020 despite the Trial Court allowing Father time to retrieve the information from his vehicle. [2]

The Trial Court found that Mother had met with her attorney regarding this termination and adoption petition and was awaiting her tax refund to file the action. However, Father filed a motion for contempt and petition for a parenting plan with the

---

[2] Father testified during trial that the recent bank statement was in his vehicle reflecting the account balance but when given a break to obtain the information, Father's attorney notified the Trial Court that Father had the "wrong folder" in his vehicle and did not present any additional information regarding the bank account to the Trial Court.

Juvenile Court on December 2, 2020, which was scheduled for a hearing on December 16, 2020. Father served the petition and motion on Mother at her home, which Mother testified had caused the Child to become visibly upset and have a "complete meltdown." On December 14, 2020, Mother and Stepfather ("Petitioners") filed a petition to terminate Father's parental rights to the Child, Makayla, in the Trial Court. As a result, the Juvenile Court action was stayed pending resolution of the adoption action filed in the Trial Court.

In their termination petition, Petitioners included the following grounds for the termination of Father's parental rights: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) failure to manifest an ability or willingness to assume custody of or financial responsibility for the Child; and (4) mental incompetence. Petitioners also averred that termination of Father's parental rights was in the Child's best interest. Father filed an answer denying the grounds for termination and that termination of his rights was in the Child's best interest. In his answer, Father alleged that Mother had interfered with his visitation with the Child. Father also included a counter-petition, requesting an order granting him immediate parenting time with the Child and entry of a permanent parenting plan concerning the Child.

The Trial Court conducted a trial on the termination petition in September 2021, during which the following witnesses testified: (1) Hope G., a half-sibling of the Child; (2) the Child, Makayla; (3) Mother; (4) Stepfather; (5) Great-Grandmother; and (6) Father. Makayla was twelve years old at the time of trial. Following Father's motion for directed verdict during trial, Petitioners conceded the ground of mental incompetence should be dismissed. The Trial Court found the testimony of Mother, Stepfather, Makayla, and Makayla's siblings to be credible. However, the Trial Court found Father's testimony not to be credible, finding as follows: "The Court has never found that a witness' testimony was utterly unreliable until this trial. Witnessing Father's demeanor, lack of consistency in his testimony, and casual nature, the Court finds Father's testimony was without merit." The Trial Court also found that other than Great-Grandmother's testimony that Father had previously been a drug addict, her testimony was unclear as to dates and occurrences and that she "appeared evasive in her answers to protect Father."

Following trial, the Trial Court entered its memorandum opinion in October 2021, finding that Petitioners had proven the statutory grounds of abandonment by failure to support and abandonment by failure to visit against Father. The Trial Court found that the relevant four-month time period for purposes of the abandonment grounds was August 14, 2020 through December 13, 2020. The Trial Court found that Father had not visited the Child since September 20, 2019 and, therefore, shifted the burden to Father to prove that his failure to visit was not willful. Determining that Father had not attempted to visit the Child for approximately fifteen months until he filed his petition requesting a parenting plan in December 2020, the Trial Court found that Father had not proven that his failure to visit was not willful.

Finding that Father made no child support payments to Mother during the relevant four-month time period, the Trial Court again shifted the burden to Father to prove that his failure to support the Child was not willful. The Trial Court found that Father was receiving benefits from the Social Security Administration for Makayla's benefit but that even after he was no longer visiting with the Child, he failed to pay child support and used her money for his own needs. The Trial Court further found that Father's expenses did not exceed his monthly income. The Trial Court, therefore, found that Father had failed to pay child support for the Child during the relevant four-month period.

Although finding that Petitioners had proven the first prong, the Trial Court found that Petitioners had not proven the second prong of the ground located at Tenn. Code Ann. § 36-1-113(g)(14). The Trial Court found that it was unable to find by clear and convincing evidence that the Child "would presently be victim to substantial harm if returned to Father's custody" and, therefore, denied this statutory ground. Additionally, the Trial Court analyzed the statutory best interest factors that were adopted in April 2021 and found that termination of Father's parental rights was in the best interest of the Child.

The Trial Court entered a final judgment terminating Father's parental rights to the Child in December 2021. In its judgment, the Trial Court incorporated the memorandum opinion verbatim and found that Petitioners had proven by clear and convincing evidence that Father had abandoned the Child due to his failure to visit and financially support the Child and that termination of Father's parental rights was in the Child's best interest. Father timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Father raises two issues for our review on appeal: (1) whether the Trial Court erred in finding by clear and convincing evidence that Father abandoned the Child by failing to visit the Child and (2) whether the Trial Court erred in finding by clear and convincing evidence that Father abandoned the Child by failing to provide financial support for the Child. Petitioners raise the following additional issues for our review on appeal, which we restate slightly: (1) whether the Trial Court erred by finding that Petitioners had not proven the statutory ground for termination of Father's parental rights located at Tenn. Code Ann. § 36-1-113(g)(14) and (2) whether the Trial Court erred in finding by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by

the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tenn. Code Ann. section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In combination with a best interest finding, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Additionally, the Trial Court is the arbiter of witness credibility of those who testify live before it. As our Supreme Court has instructed:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ⸺ U.S. ⸺, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

We first address the statutory grounds found by the Trial Court to terminate Father's parental rights. Those included two grounds of abandonment, including Father's failure to visit the Child and failure to provide financial support for the Child. Tenn. Code Ann. § 36-1-113(g)(1) (2021) provides abandonment by a parent as a ground for the termination of parental rights. We note that the termination petition was filed in December 2020 and that the relevant statute in effect at that time defining abandonment stated as follows in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> > (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian

or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A) (2021). The relevant statute in effect at the time the petition was filed provided as an affirmative defense that the parent's failure to visit or support was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I) (2021). To prove this defense, a parent must establish his or her lack of willfulness by a preponderance of the evidence. *Id.* We will address the two abandonment grounds in turn. The Trial Court correctly found in its order the relevant four-month period for purposes of the abandonment statute extended from August 14, 2020 to December 13, 2020.

Concerning abandonment by failure to visit, Father argues that the Trial Court erred in finding this ground by clear and convincing evidence because his failure to visit was not willful. Specific to abandonment by failure to visit, pursuant to Tenn. Code Ann. § 36-1-102(1)(E), a parent must have failed to visit or engage in more than token visitation during the relevant four-month period. Tenn. Code Ann. § 36-1-102(1)(C) defines "token visitation" as visitation that, under the circumstances of the particular case, "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." The burden of proof was with Petitioners to prove by clear and convincing evidence that Father had failed to engage in more than token visitation with the Child during the four months prior to the filing of the termination petition. However, the burden was on Father to prove by a preponderance of the evidence that his failure to visit was not willful.

In this case, it is undisputed that Father had no visitation during the relevant four-month period. However, Father claims that Petitioners had prevented him from visiting with the Child. Father had consistent weekend visitation with the Child up until September 2019 upon agreement of the parents. After certain incidents that occurred at Father's home, Mother stopped visitation with Father, referring to it as a "pause." According to Mother, the Child's visitation with Father was always at the Child's discretion, and the Child confirmed that she did not wish to visit with Father after September 2019.

A parent's failure to visit a child is considered willful when the parent is aware of his or her duty to visit, has the capacity to visit, makes no attempt to visit, and has no justifiable excuse for his or her failure to visit. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Our Supreme Court has held that a parent who attempts to visit or maintain a relationship with a child cannot be said to have willfully abandoned the child if his or her attempts were "thwarted by the acts of others and circumstances beyond his control." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). This Court has held that a parent's failure to visit is not excused by another individual's action unless the other

person's conduct actually prevents the parent from performing his or her obligation to visit with the Child "or amounts to a significant restraint of or interference with the parent's efforts to . . . develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d at 864 (internal citations omitted).

Although there was no court order requiring visitation, the parents had a mediated agreement allowing Father to receive supervised visitation with the Child every other weekend. Following the parents' mediated agreement, Father regularly exercised his visitation with Makayla. It is undisputed that Mother made a unilateral decision to stop Father's visitation for an indeterminate period of time despite their previous agreement. Regardless of whether Father attempted to contact Mother after she instituted the pause in visitation, it is undisputed that Mother never informed Father that the pause had ended or that he was permitted to visit the Child again. Mother even testified that she would not have allowed the visit if Father had requested visitation. We also note that Father filed his motion for contempt and petition for parenting plan prior to Mother filing her petition for termination and during the relevant four-month period.

This Court has previously found interference by a father and stepmother when they unilaterally decided to stop visitation with the mother or to restrict her visitation to supervised when she had been awarded unsupervised visitation in the parents' parenting plan. *See In re Justin P.*, No. M2017-01544-COA-R3-PT, 2018 WL 2261187, at *6 (Tenn. Ct. App. May 17, 2018). We hold that in this case, Mother's pause of Father's visits and her admission that she would not have allowed Father to visit if he had requested to do, in addition to Father's filing a motion for contempt and petition for parenting plan during the relevant four-month period, demonstrate that Father met his burden of proof of establishing by a preponderance of evidence that his failure to visit was not willful. We, therefore, reverse this ground for the termination of Father's parental rights.

The second abandonment ground for termination of Father's parental rights found by the Trial Court involves Father's failure to financially support the Child. Although we have reversed the abandonment ground of failure to visit, Father's parental duty of financially supporting the Child is separate and distinct from his responsibility of visiting the Child. *See In re Audrey S.*, 182 S.W.3d at 864. Tenn. Code Ann. § 36-1-102(1)(D) requires that a parent provide more than token payments toward the Child's financial support. Tenn. Code Ann. § 36-1-102(1)(B) defines "token support" as support that, under the circumstances of the particular case, "is insignificant given the parent's means." It is undisputed that there was no child support order in this case. However, the absence of a court order requiring a parent to pay child support does not negate that parent's obligation to pay support. *See In re M.A.C.*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. July 17, 2008) ("Though Mother was not under a court order setting support for her children, such an order is not required."). Tenn. Code Ann. § 36-1-102(1)(H) provides that every parent eighteen years old or above is presumed to have knowledge of the legal obligation to financially support his or her children.

Regarding the statutory ground of abandonment by failure to support the Child, it is undisputed that Father had not provided any financial support for the Child during the relevant four-month period. What is disputed between the parties, however, is whether Father's failure to support was willful. A parent's failure to provide financial support for a child is considered willful when the parent is aware of his or her duty to provide support, has the capacity to provide support, makes no attempt to provide support, and has no justifiable excuse for failing to provide support. *In re Audrey S.*, 182 S.W.3d at 864. In his brief, Father argues that he was prevented from supporting the Child due to Mother's refusal to provide receipts to Father of the expenses related to the Child. According to Father, he and Mother had a "system" where she would provide Father with "copies of receipts of expenditures related to the child," but Mother had unilaterally ended the system and refused to provide the requested receipts. Mother testified that she initially provided receipts to Father because he had informed her that unless she gave him every receipt, she "would not receive a dime" from the Child's social security benefits. Mother acknowledged that at some point she had stopped providing receipts to Father and stated that "he just would not turn over anything."

Regardless, it is undisputed that Father received social security benefits for Makayla of more than $600 each month during the relevant four-month period. During that time, Father was having no contact with the Child so the money clearly was not spent for the benefit of the Child. Although Father testified that he had placed that money into a savings account for the Child, he failed to provide proof of such at trial, even though the Trial Court allowed time for Father to retrieve the documentation from his vehicle. The burden is on Father to prove that his failure to provide financial support for the Child was not willful. We hold, as did the Trial Court, that Father had not met his burden of proof. We, therefore, affirm the Trial Court's finding by clear and convincing evidence of this ground for the termination of Father's parental rights.

Petitioners raise an issue concerning whether the Trial Court erred when it failed to find the statutory ground located at Tenn. Code Ann. § 36-1-113(g)(14) against Father. This ground was not found by the Trial Court or utilized to terminate Father's parental rights. Therefore, we are not required by *In re Carrington H.* to address it. *See In re Carrington H.*, 483 S.W.3d at 525 (instructing this Court to "review the trial court's findings as to each ground for termination" and the best interest analysis). Because we have affirmed a statutory ground of abandonment by Father's failure to financially support the Child, which is sufficient to support the termination of Father's parental rights, Petitioners' issue regarding Tenn. Code Ann. § 36-1-113(g)(14) is pretermitted as moot.

Finally, having determined that a ground exists for the termination of Father's parental rights, we next address the best interest analysis. Petitioners raise the best interest analysis as an issue on appeal, arguing that the Trial Court correctly found that termination of Father's parental rights was in the Child's best interest. The version of Tenn. Code Ann.

§ 36-1-113(i) (Supp. 2020) that was in effect when the termination petition was filed provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

Neither party has raised an issue concerning the Trial Court's use of the newly-enacted best interest factors. However, we note that this action was filed in December 2020, and the previous version of the best interest factors are applicable to this action. *See In re Riley S.*, No. M2020-01602-COA-R3-PT(c), 2022 WL 128482, at *13 n.10 (Tenn. Ct. App. Jan. 14, 2022), *perm. app. denied* (Tenn. Mar. 17, 2022) (holding that the newly-enacted best interest factors apply "only to petitions for termination filed on or after April 22, 2021"). During trial, Father did not object to the use of the factors enacted in April 2021, and his attorney had agreed with the guardian *ad litem* that his understanding was that the newly-enacted best interest factors were proper in this action. Additionally, this Court has held that the previous version of the best interest factors is included within the newly-enacted factors. *In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022), *perm. app. denied* (Tenn. Apr. 1, 2022) ("[T]he best interest factors relevant to this case are included in the new version of factors that went into effect in April 2021."). As such, this Court in *In re Da'Moni J.* found that a trial court's error of analyzing the new version of the best interest factors when the previous version was applicable was not reversible error in that case. *Id.* Therefore, we will proceed with our review of the trial court's best interest analysis.

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of

the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In making its decision, the Juvenile Court considered the relevant statutory best interest factors that were in effect when the petition was filed, as well as some additional factors that recently had been enacted. Although we have held that Mother had interfered with Father's visitation during the relevant four-month period, we note Makayla's testimony that even when she visited with Father at Great-Grandmother's home, Father spent approximately five hours with her over the course of the weekend, and Great-Grandmother was the adult caring for her during the visits. Father neither had attended her school or extracurricular activities nor had taken her to medical appointments. Father had supervised visits with the Child due to his drug use, and the Trial Court found that Father never had demonstrated an ability to visit with the Child unsupervised. In fact, Father's drug use appeared to be active in April 2019 at the time of his car accident.

The Child observed domestic violence while attending visits with Father. Although the violence was not directed toward her, she expressed fear during those incidents to the extent that she had hidden within the home on both occasions. The Trial Court found that

Father had not demonstrated that he had addressed his anger issues or his drug use. After the pause of visitation following the domestic violence incidents, Father waited approximately fifteen months to request visitation with the Child when he filed his petition with the Juvenile Court. The Trial Court found that Father had not demonstrated an understanding of Makayla's needs and had made no effort to meet those needs.

The Trial Court found that Makayla had experienced anxiety at the mere thought of visiting with Father, as supported by Mother's testimony of Makayla's extreme emotional distress when Mother was served with Father's petition seeking visitation and Makayla's testimony that she would be worried that Father would hurt her or Great-Grandmother if she were required to visit or reside with Father. Makayla expressed a desire not to visit with Father again.

In contrast, Makayla testified that she would be "really sad" if she never saw Stepfather again. According to Makayla, she and Stepfather colored together and talked about TV shows or Harry Potter. Makayla testified that she is a cheerleader both at her school and for an all-star team and that Stepfather often drove her to sporting events. As the Trial Court found, the Child had a deep bond with Stepfather who she considered to be her true father. The Trial Court found Makayla's bond with Stepfather to be healthy, positive, and nurturing. Makayla expressed a desire for Stepfather to adopt her, and Stepfather wishes to adopt Makayla.

Despite receiving social security benefits specifically to benefit Makayla, Father admittedly has not provided financial support for the Child since at least September 2019. Although Father claims he placed that money into a savings account for Makayla, the Trial Court found his testimony to be entirely not credible and although the Trial Court allowed Father time to retrieve documentation representing the balance of that bank account, he failed to do so. The record does not preponderate against any of these findings of fact by the Trial Court. Furthermore, Father's attorney conceded during oral argument that if termination of Father's parental rights was based solely on the Child's best interest that Father would not prevail. We find and hold by clear and convincing evidence, as did the Trial Court, that termination of Father's parental rights is in the Child's best interest.

## Conclusion

The judgment of the Trial Court terminating the parental rights of Jamie G. is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Jamie G., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE